FILED & JUDGMENT ENTERED
Steven T. Salata

September 14 2022

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

*Laura T Beyer*
Laura T. Beyer
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Case No. 22-30232 |
| KLMKH, INC., | ) |
| | ) Chapter 11 |
| Debtor. | ) |

## ORDER GRANTING MOTION TO DISMISS CHAPTER 11 CASE

THIS MATTER came before the court on the Bankruptcy Administrator's Motion to Dismiss Case or, in the Alternative, Convert Case to Chapter 7 (the "Motion to Dismiss"), filed by the Bankruptcy Administrator for the Western District of North Carolina (the "BA") on June 9, 2022 [ECF No. 23] and the BA's supplement thereto (the "Supplement"), filed on July 14, 2022 [ECF No. 93]. The court held hearings on the Motion to Dismiss on June 13, June 29, July 20, and August 12, 2022, at which counsel for KLMKH, Inc. (the "Debtor"), ARC LPW I LLC ("ARC"),[1] Southern Star Central Pipeline, Inc., and Crypto Colo Center Corp. appeared.

---

[1] Subsequent to the hearings on the Motion to Dismiss, counsel for ARC LPW I LLC was made aware that ARC LPW I LLC had transferred its judgment and associated rights to Arc Energy Development LLC, an affiliate of ARC LPW I LLC, pursuant to an Assignment of Judgment dated March 8, 2022.

Based on the matters of record, the testimony and evidence presented at the hearings, and judicial notice taken of the entire record in this case, the court concludes that the case must be dismissed.

**Background and Procedural History**

1.    The Debtor commenced this bankruptcy case on May 26, 2022 (the "Petition Date"), by filing a voluntary petition under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Debtor is a North Carolina Corporation that operates oil wells on oil fields in Kansas.

2.    This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    This is the Debtor's second voluntary Chapter 11 case in this district; a prior case was filed on March 10, 2022, under subchapter V of the Bankruptcy Code and assigned case no. 22-30102 (the "Prior Case") on the morning of a foreclosure sale scheduled by ARC. The court dismissed the Prior Case on April 29, 2022 [Case No. 22-30102, ECF No. 66], following three hearings on the BA's motion to dismiss because the Debtor failed to produce evidence of insurance as required by the operating order entered in the Prior Case. The Debtor provided the BA with insurance documentation on the eve of the first hearing, and the court continued the hearing to April 5, 2022, to give the BA an opportunity to review the documents. Before the April 5, 2022, hearing, counsel for the Debtor informed the BA's office that the Debtor did not have insurance in place, and the court continued the hearing to give the Debtor additional time to procure insurance coverage. At the hearing on April 26, 2022, the

2

Debtor introduced a proposal for Operator's Extra Expense insurance and acknowledged that the premium for the policy had been paid the day before the hearing. The Debtor further admitted that it had no workers' compensation or automobile policy. Due to the lack of insurance, the court determined that it should dismiss the case. The April 29 dismissal order also noted that as of the time of the April 26, 2022, dismissal hearing, and despite the court granting a 14-day extension of time, the Debtor had not filed any schedules or the Statement of Financial Affairs.

4. As in the Prior Case, the Debtor filed this case on the same day ARC had scheduled a foreclosure sale and less than one month after the dismissal of the Prior Case.[2] On May 31, 2022, the court entered the Chapter 11 Operating Order (the "Operating Order") [ECF No. 9].

5. Like the Prior Case, this case began with the BA filing a motion to dismiss. In the Motion to Dismiss, the BA alleged that, despite having twice reminded Debtor's counsel of the deadline to provide proof of insurance coverage (and despite the dismissal of the Prior Case within the past 30 days for failure to maintain insurance), the Debtor had failed to submit any of the following to the BA: a commercial general liability policy, an umbrella policy, an automobile policy, an inland marine policy, and a workers' compensation policy. On that basis, the BA asserted there was cause to dismiss the case or convert it to a Chapter 7.

---

[2] Despite filing this case less than one month after the court dismissed the Prior Case, there were substantial differences in the Debtor's scheduled assets and liabilities. A balance sheet attached to Debtor's Petition in the Prior Case references approximately $19.9 million in assets, but the schedules in this case include assets valued at $45,448,970.33. Similarly, the attached balance sheet in the Prior Case references approximately $19.9 million in liabilities compared with the $33,309,881.29 scheduled in this case.

3

6. The deadline to file the schedules and statements in this case was June 9, 2022. FED. R. BANKR. P. 1007-I(c). On June 10, 2022, the Debtor filed several amended schedules, including Schedules A/B and G and an amended Statement of Financial Affairs [ECF No. 38], but they contained significant errors and omissions. For example, the amended schedules and statements referenced attachments that were not filed. See, e.g., question 50 of Schedule A/B and Statement of Financial Affairs question 28. In addition, the Debtor included an attachment to the amended schedules for Part 9, question 55.1 of Schedule A/B, which lists the counterparties for its oil and gas leases, but it did not add those parties to the creditors matrix for this case. Consequently, those parties did not receive notice of the bankruptcy case.

7. The court conducted a hearing on the BA's Motion to Dismiss on June 13, 2022, which resulted in the court entering an order on June 15, 2022 [ECF No. 57]. Minutes before the June 13 hearing began, the Debtor provided the BA with additional insurance policies. In its June 15 order, the court found that the Debtor presented evidence of a general liability and workers' compensation policy and concluded that inland marine insurance coverage was no longer necessary based on the Debtor's representation that its heavy equipment had been sold. The order also found that the Debtor owned or leased one or more vehicles that were uninsured and ordered the Debtor to park each of the uninsured vehicles until it provided the BA with satisfactory evidence of adequate insurance with respect to each vehicle. The court continued the hearing on the Motion to Dismiss to June 29, 2022 (the "June 29 Hearing").

8.      On the eve of the June 29 Hearing, the Debtor filed the Motion to Allow Debtor to Use Pre-Petition Federally Insured Financial Accounts and For Other Relief From Paragraph D.1 of the Operating Order (the "Bank Account Motion") [ECF No. 66], the Motion for Interim and Final Orders Authorizing the Debtor to Pay Prepetition Employee Obligations (the "Payroll Motion") [ECF No. 67], and Motion by KLMKH, Inc. for Entry of an Order Authorizing the Debtor to Obtain Post-Petition Financing and for the Use of Cash Collateral (the "DIP Motion") [ECF No. 68] (collectively, the "June 28 Motions"). The Debtor did not notice the June 28 Motions for hearing but filed a motion to shorten notice [ECF No. 69] that asked the court to hear the three motions at the June 29 Hearing.

9.      After 11:00 p.m. the night before the June 29 Hearing, the Debtor provided the BA with proof of insurance for some of the uninsured vehicles discussed at the June 13, 2022, hearing. The Debtor's Chief Executive Officer, Randy Franklin ("Mr. Franklin"), and Tim Park, Operations Supervisor, testified on behalf of the Debtor at the June 29 Hearing.  During the hearing, the BA informed the court that the night before the hearing, she had discovered an undisclosed piece of improved real property in Kansas owned by the Debtor that was not insured. The Debtor admitted it should have known about the property and disclosed it and assured the court it would insure the property if the court continued the hearing on the Motion to Dismiss. In addition, the Debtor revealed that it lacked proof of insurance on one automobile but represented that the driver had parked the car. The Debtor also planned to reject the lease on that vehicle.

5

10. At the conclusion of the hearing, the court continued the hearing to July 20, 2022 (the "July 20 Hearing"), along with the hearing on other pending motions to afford the Debtor a sixth opportunity – between its two bankruptcy cases – to confirm that its assets were properly insured as required by the court's operating orders. The court also instructed the Debtor, among other things, to file all necessary amendments to its schedules and statements and to provide proof of insurance to the BA by the close of business on July 15 to give the Debtor ample time to finally address the concerns raised by the BA in her Motion to Dismiss and to give the BA sufficient time before the continued hearing to review the documents. In addition, the court directed the Debtor to serve the holders of oil leases with notice of this bankruptcy case as soon as possible following the June 29 Hearing.[3] The court concluded the hearing by observing that "today the case is not going to be dismissed, but if things aren't corrected by July 20th, on that day the case will either be dismissed, or the case will be converted."

11. The court did not hear the June 28 Motions at the June 29 Hearing and entered an Order Denying Motion to Shorten Notice [ECF No. 76] on July 1, 2022, noting that the motion sought to shorten notice to the extent it would essentially be eliminated. The order also instructed the Debtor to notice the June 28 Motions for hearing on July 20, 2022, or a later date.

---

[3] Despite the court's instruction, the Debtor waited until July 18 – two days before the July 20 Hearing – to file a certificate of service reflecting service of the Notice of Chapter 11 Bankruptcy Case [ECF No. 4]. The certificate of service provides that the holders of oil leases were served by US Mail on Sunday, July 17, which means that the lease holders likely did not receive notice of the hearing in time to respond.

6

12. The BA conducted the § 341 meeting of creditors on June 22, 2022, and filed a proceedings memo on June 24, 2022, which includes an extensive list of amendments the Debtor needed to make to the schedules and statements. The § 341 meeting was continued to July 6, 2022, but had to be further continued to July 13, 2022, because, as of the morning of July 6, the Debtor had not provided the information requested by the BA at the original § 341 meeting or filed any amendments to its schedules and statements. On July 7, 2022, the Debtor filed the Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest (the "2015.3 Report"), more than three weeks after its due date of June 15, 2022. See FED. R. BANKR. P. 2015.3.

13. Less than two hours before the continued § 341 meeting was scheduled to begin on July 13, 2022, the Debtor filed amended schedules and statements [ECF No. 87], which omit or misstate material information as outlined by the BA in the Supplement. In addition, portions of the amended schedules and statements were illegible due to text errors and "wrapped text." The BA conducted the continued § 341 meeting on July 13, but she had to further continue it to August 3, 2022, to afford herself and creditors an opportunity to review the amended schedules and statements, which had been filed at the last minute. The Debtor filed further amended schedules and statements on July 15, 2022 [ECF No. 96]. The Debtor never filed a Monthly Status Report in this case as required by 11 U.S.C. §§ 1106 and 1107,

Rule 2015 of the Federal Rules of Bankruptcy Procedure, and paragraph H of the Operating Order.

14. At 6:47 a.m. on the morning of the July 20 Hearing, the Debtor filed the Amended Motion by KLMKH, Inc. for Entry of an Order Authorizing the Debtor to Obtain Post-Petition Financing and for the Use of Cash Collateral [ECF No. 104] but did not notice the motion for hearing. As a result, the court issued a Notice of Defective Entry or Filing [ECF No. 105] for failure to comply with the Local Rule 9013 noticing requirements. The Debtor filed a Motion by KLMKH, Inc. for Authorization for the Debtor to Obtain Post-Petition Bridge Financing from Natan Holdings, LLC Under 11 U.S.C. § 364(b) (the "Bridge Financing Motion") [ECF No. 122] on August 2, 2022, and noticed it for hearing on August 24, 2022 – well after the conclusion of the hearing on the Motion to Dismiss. Thereafter, on August 8, 2022, the Debtor filed an Amended Motion by KLMKH, Inc. for Authorization for the Debtor to Obtain Post-petition Bridge Financing from Natan Holdings, LLC Under 11 U.S.C. § 364(b) (the "Amended Bridge Financing Motion") [ECF No. 125], but the document included several blank pages and received a defective notice from the court. Minutes later, the Debtor re-filed the Amended Bridge Financing Motion [ECF No. 126] to remove the blank pages and noticed it for hearing on August 24, 2022.[4] Finally, the Debtor filed the Second Amended Motion by KLMKH, Inc. for Entry of an Order Authorizing the Debtor to Obtain Post-petition Financing and for the Use of Cash Collateral (the

---

[4] The Debtor incorrectly linked the Notice of Hearing to the Second Amended DIP Motion on the docket in CM/ECF [ECF No. 128], but the notice itself refers to the "debtor's motion to obtain bridge loan financing from Natan Holdings, LLC."

"Second Amended DIP Motion) [ECF No. 127] but did not notice it for hearing despite the court's specific instruction in its July 1, 2022 Order. The Debtor also never noticed the Bank Account Motion or the Payroll Motion for hearing.

15. The court began the July 20 Hearing by asking the BA for an update regarding the status of the Debtor's insurance. She reported that the Debtor had insured the commercial property discussed at the June 29 Hearing, but the Debtor also added a large vehicle or big rig called a Franks pulling unit to the amended schedules filed on July 13. In addition, the Debtor had testified at the continued § 341 meeting that the vehicle could be driven and was uninsured. At her insistence, the Debtor added the vehicle to its general commercial liability policy. With that, the BA acknowledged that the issue regarding lack of insurance had finally been "put to bed," but it took four months after the commencement of the Prior Case and six hearings between the two cases to do so.

16. Counsel for ARC then walked the court through several press releases and the prior testimony of Mr. Franklin to demonstrate that the court should view the statements and forecasts of the Debtor and its representatives with skepticism given the number of them that proved to be false, exaggerated, or otherwise misleading. By way of example, a July 1, 2021, press release referred to a new system that would bring 20–30 new oil wells online in 2021 and increase oil production from 30–50 barrels per day to 100–120 barrels per day. An Oil Sale Summary, however, indicated that the Debtor was not producing 30 barrels per day at the time of the press release or at any other time during 2021, and according to Mr. Franklin, the

final piece of the system was only in use for a two-week period. As of the date of the July 20 Hearing, only 9 or 10 wells were online. Another press release issued on March 11, 2022, advised that the Debtor, a division of Orpheum Property, Inc. ("Orpheum"), had filed bankruptcy, but the separate assets and liabilities of Orpheum were not affected by the bankruptcy filing. In fact, Mr. Franklin confirmed in his testimony at the June 29 Hearing that the Debtor and Orpheum had merged and were the same company, making the March 11 press release patently false. In his testimony at the July 20 Hearing, Mr. Franklin admitted that these press releases were inaccurate and that the Debtor had done nothing to correct the misstatements even though the company is publicly traded and investors would have relied on the press releases. Mr. Franklin testified at the April 26 dismissal hearing in the Prior Case about letters of intent totaling in excess of $5 million, but in reality, the Debtor's Amended Bridge Financing Motion and Second Amended DIP Motion filed in this case sought approval of approximately $600,000 in financing – far short of the amount referenced in Mr. Franklin's testimony at the dismissal hearing in the Prior Case. Finally, Mr. Franklin testified at the June 29 Hearing and again at the July 20 Hearing that current oil production was 40 to 46 barrels per day, but when pressed on cross examination, Mr. Franklin admitted that the Debtor had produced between 300 and 400 barrels of oil in the month before the July 20 Hearing, which is closer to 13 barrels per day. That testimony was confirmed by the run tickets introduced into evidence at the July 20 Hearing.

17. Mr. Franklin's testimony at the July 20 Hearing was largely confusing and difficult to follow, particularly as it related to the Debtor's current performance and future projections. Counsel for the Debtor at one point even stated: "I'm getting different numbers, Mr. Franklin, and I'm a little confused." Mr. Franklin testified that the Debtor had 9 or 10 wells online, and they were in the process of improving those wells by cleaning them up and changing out old parts. He indicated that the Debtor needed about $500,000 in financing to bring an additional ten wells online and estimated that the Debtor had approximately 60 wells total that were capable of producing oil. In addition to needing financing to bring additional wells online, Mr. Franklin described problems with insufficient storage capacity and difficulty getting haulers to pick up the oil quickly enough. Despite these difficulties and acknowledging that the Debtor was not pumping any oil as of the Petition Date, Mr. Franklin forecasted that the Debtor could have more than 20 wells producing 70 barrels per day by November. In reality, as of the July 20 hearing, the Debtor had half that many wells operating, had pumped between 300 and 400 barrels of oil, generated only approximately $40,000 in revenue, and had to rely on equity contributions or loans from entities such as Natan Holdings, LLC ("Natan Holdings") to operate. The contributions and loans from Natan Holdings were deposited into the bank account for the Debtor's subsidiary, Diversified Energy Management Co., LLC, to pay field workers, cover capital expenditures, and continue operating while accruing management payroll and fees for Debtor's counsel. In sum, Mr. Franklin painted an optimistic picture for the Debtor's future in his direct examination, but

11

upon cross examination, it became clear that the Debtor's projections had no basis in reality, especially considering its historical and current state of operations.

## Discussion

18.    As the party seeking dismissal or conversion of this Chapter 11 case, the BA bears the burden of establishing cause under section 1112(b)(1) of the Bankruptcy Code. Section 1112(b) provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1112(b)(1). Subsection 1112(b)(4) sets forth a non-exhaustive list of examples of cause sufficient to warrant conversion or dismissal. The court finds that the BA has established the following as cause for dismissal: "gross mismanagement of the estate," "failure to comply with an order of the court," and "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter." 11 U.S.C. § 1112(b)(4)(B), (E), and (F). The presence of any one of these statutory factors or any other factor deemed important by the court is sufficient to warrant dismissal or conversion.

19.    With respect to section 1112(b)(4)(E) and the Debtor's failure to timely comply with an order of the court, the Operating Order required the Debtor to, among other things, close its pre-petition bank accounts and to open new post-petition bank accounts. On June 28, 2022, the Debtor filed the Bank Account Motion seeking to be excused from the requirements of the Operating Order, but the Debtor failed to

properly notice the motion for hearing. In the meantime, the Debtor continued to use its pre-petition bank accounts without court authority.

20. Also with respect to section 1112(b)(4)(E), while the Debtor finally has provided proof of insurance, it was required to provide the BA with proof of insurance coverage on all property of the estate within ten days of the Petition Date as well as copies of complete insurance policies within 30 days pursuant to paragraph E of the Operating Order. The Debtor fell far short of complying with this provision of the Operating Order, which is particularly egregious since the Prior Case was dismissed one month prior to the Petition Date for failure to maintain adequate insurance.

21. Paragraph F of the Operating Order provides that the Debtor may not use estate property to pay pre-petition debts without prior order of the court. While the Debtor filed the Payroll Motion on June 28, 2022, seeking permission to pay pre-petition employee wages, reimbursable expenses, and withholdings, it failed to properly notice this motion for hearing. Mr. Franklin testified at the July 20 Hearing that all field employees had been paid. Those payments lacked court approval.

22. At the June 29 Hearing, the court ordered the Debtor to serve notice of this bankruptcy case on the counterparties to all oil leases as soon as possible. Despite the court's bench order, the Debtor did not serve the counterparties until Sunday, July 17, 2022, on the eve of the July 20 Hearing on the Motion to Dismiss and the Motion of ARC LPW I LLC for Relief from Stay and Relief Pursuant to 11 U.S.C. § 362(d)(4) (the "Stay Relief Motion"), resulting in a lack of due process for those parties.

23. The court also finds cause for dismissal for gross mismanagement of the estate under section 1112(b)(4)(B) for many of the reasons the court found cause pursuant to section 1112(b)(4)(E). See In re Creech, 538 B.R. 245, 251 (E.D.N.C. 2015) ("Courts have generally found gross mismanagement of the estate where debtors fail to seek court approval before taking certain actions outside the ordinary course of business, such as paying prepetition debts or incurring debt, where debtors file monthly reports without closely monitoring them, and where the business lacks effective management.") (citations omitted). The Debtor failed to properly list its assets and have them insured at the outset of this case. The Debtor never filed a monthly report. It filed "first-day" motions to pay prepetition wages and continue using pre-petition bank accounts but did not file those motions until 30 days after the Petition Date and further failed to notice them for hearing. The Debtor filed a motion to incur debt to obtain post-petition financing and to use cash collateral on the eve of the June 29 Hearing and amended it on the morning of the July 20 Hearing but did not notice that motion for hearing. The Debtor filed the Bridge Financing Motion and Amended Bridge Financing Motion on August 2 and August 8, 2022 (the "Financing Motion"), and noticed it for hearing on August 24, 2022, almost one month after the conclusion of the hearing on the Motion to Dismiss. Because the Debtor did not notice the Financing Motion for hearing and the court has not approved the use of cash collateral, the Debtor is relying on equity contributions and loans from Natan Holdings, then injecting those funds into the bank account for its subsidiary, resulting in a lack of transparency in the Debtor's operations.

24. In addition, the Debtor has issued press releases that are false and misleading or, at a minimum, grossly overstated. Mr. Franklin acknowledged the egregious misstatements in the press releases at the July 20 Hearing and admitted that the Debtor had not taken any steps to retract or correct those misstatements. The press releases and inconsistent testimony of Mr. Franklin cause the court to view the statements and forecasts of the Debtor and its representatives with skepticism. In short, the court has no faith in the Debtor's forecasts reflected in its pro forma budget. Aside from the fact that the pro forma budget relies on the price of oil remaining at approximately $100 per barrel, which is considerably more than the average price of oil over the last few years, it also is contingent on the Debtor getting debtor-in-possession financing in order to bring more wells online and increase both production and storage capacity. The Debtor, however, never scheduled the Second Amended DIP Motion for hearing and did not schedule its Financing Motion for hearing until well after the hearing on the Motion to Dismiss, which would push the Debtor's projections out two to three months at a minimum (if the court would even approve the Financing Motion). The Debtor clearly understands that it requires financing for its business to survive. It defies logic that the Debtor did not have the Second Amended DIP Motion or the Financing Motion prepared for hearing before or, at a minimum, alongside the hearing on the Motion to Dismiss and Stay Relief Motion. Finally, Mr. Franklin acknowledged that the figures in the pro forma budget were estimates that far exceeded anything the Debtor had done in the past.

25. In sum, it appears the Debtor used this bankruptcy case to start its business, instead of reorganizing, which is not a proper bankruptcy purpose. The Debtor was not pumping any oil as of the Petition Date and had no revenue before the case was filed. While that improved some during the pendency of the case, the evidence shows that the Debtor lacks sufficient revenue to pay its overhead, the administrative costs of this estate, or its creditors. The Debtor wants to believe it is producing 30 to 40 barrels of oil per day, but the testimony was that the Debtor produced only 300 to 400 since the Petition Date for a variety of reasons, including lack of storage capacity and issues scheduling pickups by haulers. The Bankruptcy Code contemplates using a bankruptcy case to reorganize or rehabilitate an existing enterprise or preserve going concern value of a viable or existing business rather than using the stay to stave off creditors as it gets its business off the ground. See 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[5][a] (16th ed. 2011) ("If continuing a particular chapter 11 case would promote the twin goals of preserving viable businesses and maximizing the creditors' return, then the case is probably not a candidate for conversion or dismissal under section 1112(b).").

26. Furthermore, the court also finds that cause to dismiss exists under section 1112(b)(4)(F) due to the Debtor's failure to satisfy filing and reporting requirements. This case commenced on May 26, 2022, and the Debtor has not filed a monthly operating report. Standing alone, the court would not dismiss a case for a failure to file a monthly report but given the numerous other problems, the court finds that it is cause to dismiss this case. As one court put it, operating reports and

16

the financial disclosures contained therein are the "life blood of the chapter 11 process. . . . They are the means by which creditors can monitor a debtor's post-petition operations." In re Berryhill, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991) (citing In re Chesmid Park, 45 B.R. 153, 159 (Bankr. E.D. Va. 1984)). As such, they are an important obligation of a Chapter 11 debtor in possession.

27. The Debtor failed to comply with other deadlines in this case. The Debtor was still filing amendments to the schedules and statements on July 13, 2022, and July 15, 2022. Based on statements of the BA at the July 20 Hearing, the schedules and statements are likely still incomplete, and there have been mistakes on nearly everything the Debtor has filed on the docket. In addition, the Debtor filed the periodic report required by Rule 2015.3 of the Federal Rules of Bankruptcy Procedure late.

28. Finally, the court concludes that the Petition was a bad faith filing, which only adds weight to the court's conclusion that the case should be dismissed for cause under section 1112(b)(1). The Fourth Circuit established a two-part test when evaluating whether a Chapter 11 filing lacks good faith: the movant must establish both "objective futility" and "subjective bad faith." See Carolin Corp. v. Miller, 886 F.2d 693, 701 (4th Cir. 1989). As the U.S. District Court for the Middle District of North Carolina observed in affirming dismissal of a chapter 11 repeat filing:

> While the Carolin court did emphasize that dismissing a bankruptcy case for lack of good faith at the time of filing, prior to a full development of the debtor's situation, was a drastic determination not to be made lightly, that case did not consider successive filings. The concern regarding dismissal of cases at an early stage is simply not present in instances of repeat filings.

17

Rain Tree Healthcare of Winston-Salem, LLC v. J & F Partners, LLC *(*In re Rain Tree Healthcare of Winston-Salem, LLC*)*, 585 B.R. 777, 786 (M.D.N.C. 2018) (citing Carolin Corp., 886 F.2d at 702) (internal citation omitted); see also In re Carter, 500 B.R. 739, 746 (Bankr. D. Md. 2013) ("The court concludes that, if faced with a bad faith serial filing case—especially one with gross malfeasance by the debtor in the preceding case—the Fourth Circuit would determine that a bankruptcy court has discretion to dismiss the case upon a showing of subjective bad faith without the need to determine objective futility." (citing In re Delray Assoc. Ltd. P'ship, 212 B.R. 511, 515 (Bankr. D. Md. 1997)). Considering the Debtor's subjective bad faith in conjunction with the cause for dismissal under section 1112, the court easily concludes that this case should be dismissed as having been filed in bad faith. This is especially true when considering the totality of the circumstances, particularly given the history of the Debtor's two cases. Moreover, the court's skepticism about the Debtor's forecasts and its finding of gross mismanagement cause it to conclude that the Debtor lacks the prospect of rehabilitation and that the case is objectively futile.

29. At the June 29 Hearing, the court expressed to the Debtor that it was skeptical and troubled based on what it had learned during the hearing but that it did not believe it would be appropriate to dismiss the case that day. The court continued the hearing to give the Debtor ample time to file complete schedules and statements and to confirm that all of its assets were properly insured. The court also directed the Debtor to serve the holders of oil leases with notice of this bankruptcy case as soon as possible following the June 29 Hearing. The court concluded by saying,

18

"We already had one bankruptcy case that resulted in a dismissal. This is a second bite at the apple, and I'm going to keep this on a really short leash." Despite the court's admonition, the problems have continued, there has been a lack of transparency, and the theme of the case has been last-minute filings by the Debtor in response to discoveries by the BA. The Debtor argued that it was being picked on by the BA, but it is incumbent upon the Debtor to ensure the accuracy, truthfulness, and completeness of its petition, schedules, and statements. It is not the BA's job to remind a debtor about its required filings. Bankruptcy is not intended to be a game of "gotcha." This is especially true in a case such as this that was filed immediately on the heels of a previous case that ended in a dismissal, largely for the same reasons as the dismissal in this case. Simply put, if the Debtor thought it had a chance of surviving dismissal in a subsequent case, it must have understood that it needed to have everything in order upon the filing of the second case. To the contrary, this case picked up right where the Prior Case left off.

30. For all of these reasons, the court finds and concludes that cause exists to convert or dismiss this case. While the Bankruptcy Administrator requested conversion to pursue potential Chapter 5 causes of action, the record lacks any description of what those causes of action might be. The creditors attending the hearing requested dismissal. Given the nature of the Debtor's assets and the difficulty a trustee would have in liquidating them, the court concludes that dismissal is in the best interest of creditors and this estate.

NOW, THEREFORE, based on the foregoing and the entire record in this case, it is hereby ORDERED that this case is DISMISSED.

*This Order has been signed electronically*             *United States Bankruptcy Court*
*The Judge's signature and court's seal*
*appear at the top of the Order.*